I have four cases on the calendar before the court this morning, but before we turn to those, we have what I will refer to as some happy business to attend to. I am pleased and honored today to move the admission to the Bar of the Court of one of my law clerks, Kendra Purcell Robbins, and I now will formally make the motion. I move the admission of Kendra Purcell Robbins, who is a member of the Bar in good standing of the highest court of Virginia. I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. I would just add that those are the official magic words that have to be spoken by the individual making the motion, but I would just want to say that in addition to that, Ms. Robbins has been a clerk in my chambers since August and has been an invaluable part of our chambers team and has done excellent work, and I move her admissions. With that, I will recede to my panel colleagues. After due consideration, Judge Shaw, your motion is granted and the applicant is admitted. You swear or affirm that you will purport yourself an attorney and counsel of this court, and that you will support the Constitution of the United States of America? I do. Congratulations and welcome to the Bar of the United States Court of Appeals. Ms. Robbins, congratulations. We look forward to seeing you in court. Thank you. And soon. I too, and I welcome it. With that completed, we will turn everyone to the cases before us today. We have four cases on the calendar. Two of those cases, however, have been submitted on the briefs, and we will not be hearing argument. I will just, for the record, note those two cases. The first one is number 06-5079, Van Allen v. the United States, and the second one is number 07-3055, DiCioso v. the Office of Personnel Management. Again, those cases are being submitted on the briefs. We have two cases on the oral argument calendar. The first one is number 06-1584, Frazier, Lane v. Christensen. I will just note for counsel on this case and on the second case, because of our court recording system, when you approach the lectern, before you start your oral argument, if you could please state your name clearly and articulately so that the recording system picks it up and so that we on the bench understand the correct pronunciation. Now, before we step up to the podium, please, before we begin the argument, and this is Mr. Schwartzfall, don't start the clock until I indicate, but what we're saying now should be recorded. You have filed a motion to withdraw from contention claims 1 and 19, the two independent Mr. Adams, although he didn't file any papers formally opposing, there was an indication in your papers that he would oppose. Given those circumstances and given that I don't really think it was necessary for you to file a motion to withdraw, we can simply, to withdraw a record in open court today that, in fact, you are withdrawing your contentions with respect to claims 1 and 19, and that will suffice and will serve the purpose of your motion. That is fine, Your Honor. Since it was an unusual process, I thought maybe to bring it to the attention of the court, we would do it by the motion, since we're not able to get a stipulation. I will note for the record that after 5 p.m. on Friday, I did receive a response from Mr. Adams, which the court may have not received yet, in which he indicated he wasn't opposing it, but nonetheless, in response to your... That he was or wasn't? Was not. Was not, okay. And nonetheless, in response to your question, Your Honor, yes, the plaintiffs or counts are withdrawing their contentions relating to obviousness with regard to claims 1 and 19. All right, well, thank you. With that, then, we'll consider those contentions withdrawn with respect to claims 1 and 19, and we will deny the motion is moot. It's been taken care of. Okay. Okay. And with that, whenever you're ready, you can start with your argument. Again, what we just discussed wasn't in part of your argument time, so you'll have your full time. Thank you. So you can proceed whenever you're ready. Thank you. May it please the court, I'm Jane Schlicht. My co-counsel is Jeffrey Soko, who's sitting at the counsel table with me. We represent the plaintiff appellants. Also present right behind me is Mr. Frazier, who is the owner of the 845 patent. Now, at issue in the 845 patent is a revolutionary new process in water well rehabilitation, and this revolutionary process uses controllable, adjustable, percussive wave energy generated by an air gun to not only clean the screen of the water well, but to permeate beyond the bore into the ground formation surrounding the well bore so as to clean out the impediments in the ground formation and to unclog so as to enhance and increase water production. The issue in this case is obviousness. That is correct, Your Honor. And as you recognize, the Supreme Court has issued its opinion in KSR, and according to the motion papers we talked about just a moment ago, KSR somehow led you to believe that it was appropriate to withdraw claims 1 and 19. What in KSR led you to conclude that claims 1 and 19 were invalid? Well, I don't know that we're necessarily conceding that they're invalid. What we did is we withdrew them so as to just eliminate from the contention as to whether or not this court has to decide that in fact they're patentable or they're not obvious. The reason we did what we did is that- Well, you've let stand the lower court's determination of invalidity. That is correct. But what was it in KSR that influenced your decision with respect to those claims? Certainly. Our case has always been about air guns and gas guns. That's what Lane uses in their bore blast processes. That's what we claimed is the basis for the infringement. The patent itself says the preferred embodiment is a gas gun. Our case has never been about sparkers. Sparkers were added to the application because one of the inventors, Mr. Jansen, believed that the sparker technology might advance further such that it might be able to be used to do something beyond cleaning well springs but be able to penetrate into the ground formation to unclog it. That hasn't happened. And so one of the discussions in the KSR decision, particularly at page 16, is a discussion about how patentees, particular applicants, should not overreach. And our concern was that because that particular technology had not advanced, and it certainly isn't critical to what we're pursuing in this case, we made the decision that we would simply withdraw those from contention. We think it makes the case easier, too, because the defendants and appellees in this case have erroneously stated that all of the claims require sparkers when in fact that's not true. So now when we're talking about claims 2 through 7 and claims 20, we're all on the same page as talking about percussive gas spinning apparatuses, air guns, and high-pressure gas guns. But claim 1 has a Marcuse group that claims that air gun, a sparker, or a combination thereof, and you've conceded that claim. So it seems to me that that concession sweeps in claim 2 as well. No, we don't agree with that. We've looked at the notion of Marcuse claims, and we've come to the conclusion that with the Marcuse claim you still can have limitations, as was done in claims 2 through 7, namely limiting the use of the apparatus to that of a percussive gas spinning apparatus or air gun used in performing the various steps that are identified in claim 1. Do you have any basis for that? Any case support? I don't believe I have a case support. I would call on my co-counsel, Mr. Soko, on that issue. You're turning over the rest of your argument? Just answer that question. With respect to that being a Marcuse claim, it would seem that limiting a Marcuse claim is well recognized. First, with respect to the examining attorney, the examining attorney had no problem issuing claim 2 along with claim 1, and there's the legal precedent of it has no standing with respect to limiting it. It has no meaning either. But if claim 1 says, you know, my invention includes a method involving anyone from a group consisting of air guns, sparkers, or a combination thereof, and that claim is held invalid and that invalidity ruling is not challenged, then on what basis can you contend that claim 2, which simply says, simply selects one of the members of the Marcuse group, imparts patentability when you conceded that the group itself doesn't provide patentability? With respect to validity, the Marcuse group is a broader group of claim construction, which includes more than gas guns. And with respect to claim 2, it's just... But if you, I guess, isn't the concession of that broader group a concession with respect to each member of that group, or am I wrong? Your Honor, I don't believe that would be a correct interpretation of the Marcuse group based on the fact that the examiner allowed the claim, the fact that there's no NPEP rule that suggests that the Marcuse group would be disallowed if it were limited to simply the pending claim, claim 2, the theory of claim differentiation, and the fact that one should be allowed to claim a broader interpretation of the claims and then narrow it as well. Thank you. I don't want to take all your time. I appreciate your response. So as I was describing the invention, this is all done without the hazards of dynamite, and that's what was the advancement of the invention. Now, the prior art submitted by the defendants at trial never disclosed this particular revolutionary process. In fact, it took three peoples with different experience in three different disciplines to develop a new process, and to everyone's amazement, it worked. Now, Lane was given the opportunity to develop this particular idea, and when those of ordinary skill in the art employed at Lane considered the idea of using an air gun to clean a well screen, they simply rejected it as a silly idea. And in fact, even the three inventors ultimately were not even sure that it was going to work. They had some reservations until they actually tried it on a well in Madison, Wisconsin, and produced unexpected results. This case was tried to an eight-person jury, and the jury heard evidence for three days concerning the problems and hazards of the conventional water well rehabilitation processes such as chemicals and dynamite. They heard the inventors testify about how the invention came to be. They heard about Lane's opportunity to develop the invention as rejection of the idea. They heard about the differences between the prior art and the invention, and they also heard testimony about the surprising results that the invention produced. For example... There's a question here about whether Dr. Driscoll, the expert, his testimony should or should not have been stricken. Did Dr. Driscoll testify at all about any of the limitations set forth in the dependent claims? Either the pressure, volume, or interval limitations of Claims 3, 4, 5, 6, 7, and the deflector of Claim 20? I don't believe that he testified to that because he was not an expert in the air guns. It was Mr. Chominski. So if the... in light of your withdrawal of Claims 1 and 19, there's a question with respect to Dr. Driscoll's testimony. Is that relevant at all? Oh, certainly it still is relevant because Claims 2 through 7 are dependent on 1, and perform the steps that are listed in Claim 1. Claim 20 is dependent on Claim 19, and it necessarily performs the steps listed in 19 through use of a high-pressure gas gun. And so his testimony about the differences between the invention that constitutes the process of performing those steps and the differences between what's in the prior art is certainly highly relevant to that issue. Further... But if you look at all of the steps that are in the independent claim, you're no longer looking to that for patentability. You're no longer looking to the... you're relying on the dependent claims. We're relying on the dependent claims, but the dependent claims encompass the steps of Claim 1. It's just that they're limited... I'm certainly aware of that. They're limited to the use of an air gun. And also, Mr. Driscoll also testified to the standard of ordinary skill in the art, and he has a great deal of experience in water wells. He wrote one of the bios in the industry, and so his testimony certainly was pertinent on that issue as well. Ms. Shulman, you're into your rebuttal time. Do you want to save that? I do. Okay. Well, we'll give you your full five minutes. Okay. Thank you. Thank you. We'll hear from Mr. Adams. Thank you, Your Honor. Before my time begins, with respect to the motion, we did FedEx a response to that. Obviously, it's moved, but that was sent out Friday, so the court probably got it today. We did serve that on Friday with counsel. Okay. Well, that's been taken care of, so you can head right into your argument when you're ready. Thank you very much. I'm ready. My name is Rob Adams. I represent Lane in this case. Counsel started off her argument by stating what they've stated to the lower court in the paper numerous times, that this was a revolutionary process. It wasn't a revolutionary process. This process basically took an air gun, which their own expert admitted it was known that that air gun could be used in wells, in water wells, in the industry, prior to the filing of the patent. Took that and combined it with the use of a video camera to monitor, and then the patent, the method patent goes on to say that after monitoring, you adjust. Those three features, use of the air gun, monitoring, and then adjusting, is the basis of the method patent that was given to the 835 patent. And it's clear that it is obvious based upon KSR, based upon the lead fraud case. This is a much more straightforward case. Here, essentially, you can find it is obvious based upon solely the Gibson patent, which the patent examiner said and rejected all of the claims initially, because he found that Gibson and this use of the device, that they are substantially identical. And it was only after that they modified their patent and submitted an amended claim to insert monitoring that the patent was allowed. But the problem was, is that monitoring and the use of video cameras to monitor out in the marketplace had been done since the early 80s. We cited in the district court, one of the complaints against the district court in this case, is that the district court did not review all of the prior art. The district court, as the court will see from the opinion, which I believe is in the appendix at 35, the district court walks through each of the elements of the prior art, talking about Gibson, talking about the Stuart Smith article on monitoring wells, and explains why it was obvious. And, in fact, the district court noted that even a cursory review of this information indicates that it was obvious. And this was based upon a Graham analysis using the three steps. Counsel also brought up in the papers that the district court made a couple of references to using the word novel. I would submit, and they argued that it was air to use the word novel. That's the use of just a word. It does not mean that the analysis is flawed. And it's clear from the district court's opinion... You're saying the judge was just using that as a shorthand. Definitely. It's clear that she's using it as a shorthand because she goes on to explain prong two of the Graham versus John Deere analysis, why there are differences between the prior art and the claims in the invention. Now, if she was using the wrong term, novel, using it as a term of art to describe novelty, she would not have gone on to make that explanation. Also, if she was using that term inappropriately, then I believe that her decision with respect to Mr. Driscoll, their expert, also would have been different. It is clear that the judge recognized the criteria for finding obviousness and simply used the word novel when she probably should have referred to differences. But it really makes no difference because the analysis was appropriate and the court's decision was appropriate. Mr. Adams. Yes. Could you turn to Claim 20? Yes. The defendant claim on Claim 19. Yes. There's very little that the parties have called our attention to in the record about Claim 20. There appears to be conflicting testimony from Mr. Jansen on the one hand and Mr. Williams on the other. Your opponent cites Mr. Jansen and you cite Mr. Williams and neither of you refers at all to the other one. But putting the two together, it looks like the two witnesses simply took opposite positions with respect to whether the deflector was found in the prior art. Well, Jansen definitely said that the deflector was not within the prior art. Right, and Williams said that it was. Well, let me just finish the question. Just to say the obvious question is why isn't that a jury question? I don't believe it is a jury question because the judge can make a finding of obviousness based upon the evidence that was before. Obviously it went to the judge. What evidence was there beyond the two witnesses that would have justified the judge in effectively overriding the jury's credibility determination between the two of them? Well, the evidence beyond that was there was also another side I wanted to provide the court, and that was in Mr. Fraser's testimony, and this is in the record at 4809 line 24 through 4810 line 3. And he is asked about the deflector, and he describes it as simply a shield to deflect energy. And that's all the device was, and there was nothing new or innovative about using a shield to deflect energy. Well, but stop, if you would, right there. You say there's nothing new or innovative. How do we know? I mean, what you say sounds plausible, but what in the record tells us that? Well, really the only thing that we all have to rely upon is the testimony of Fraser's, describing it simply as Shield Williams, and then obviously Jansen is against that. I think that based upon just a common sense analysis and knowing that the device claimed alls it is is a shield on the top to deflect energy, that type of shield is known to be used by those skilled in the art. How do we know that again? Well, in fact, we gave an example of a surge block, and that's what's in the record. And this is 518, 858, I'm sorry, exhibit 858? I believe that's correct. Okay, now I was going to ask you about that. Where does that come from? We aren't told about 858 or its provenance. What is that? We're just looking at a picture in the appendix. The surge block was an exhibit that we used actually with a plane witness, and unfortunately his testimony did not make it into the record that I saw, and we would be happy to provide that, but he explained it. Do you have a citation for the transcript or anything for that testimony? It is the testimony of the lane witness, and it is not within the record. Not in the appendix, but within the record. It is within the trial court record. The trial court record is the record of appeal. Understood. It is the trial court record, and it was the testimony of a lane witness who described what a surge block was and then referred to the deflector. We then used that exhibit with Dr. Williams, and when we specifically asked him about 1020, we asked him, well, was this device known to be used by people skilled in the art? And he said yes. And in fact, the device again, the device itself, the exhibit, I believe the court has a copy of that. That's on page 4577. Yes. This is what we're talking about. The device again shows that this deflector was nothing new or novel. All it is is basically a device at the top, and in their method, according to claim 20, you would put that at the top over the gas gun to deflect energy. Now, that is something that based upon our expert, Dr. Williams, which was uncontroverted by their expert, Dr. Bristol or Mr. Chemelsky, nobody contradicted that other than Mr. Jansen, who was not qualified as an expert in that area. Obviously, he was one of the inventors, and in fact, one of the issues in dispute in the case that they raised is that Jansen and Taylor were not allowed to provide expert opinion. Well, they didn't, and the reason why they didn't and the court properly denied them to provide expert testimony is because they never submitted an appropriate expert report. So that is testimony. While he may have answered that from a lay opinion, and in fact, that was in my cross-examination when I asked him that question, and he said, well, no, that is not something that I'm familiar with, or I can't remember his response. But actually, Your Honor, I believe his response was that that is not used in the art, or it's something that was new. But I believe the testimony came out in my cross-examination of Mr. Jansen. And again, he was not qualified as an expert on those materials. In your cross of Mr. Jansen, he said he was unfamiliar with any prior use of that deflector in the art. That's his answer. Thank you for pointing that out. We have it. We have that. And that's significant, because he's not necessarily saying that it is definitely not out in the prior art, and in fact, he was not an expert qualified to make that statement. I wanted to go into that area, but then when he said he's not familiar with that, obviously I did not. Okay, now just very briefly, I don't want to take up all your time on this. This Exhibit 858, was that admitted into evidence? It was. It was admitted as, and it was identified as, and if you again could describe for me, what is the prior art that it's identified as being? It's an example of a deflector, but that device is called a surge block. Right, but I mean, this is a surge block. Is this just somebody's artist's drawing of a generic surge block device, or is this a specific surge block that is found in the prior art and was identified as such? There's obviously a difference. I mean, one could draw a picture. I think it's specific, but right off the top of my head, Your Honor, I don't recall exactly where that exhibit came from. We use that because that is a common tool used in the industry. You said something about a lane witness that testified about that surge block? Yes, that would have been Mr. Jansen that Judge Bryson was referring to. Well, but that would have been, his testimony about this exhibit, I take it, was in a different place from the testimony that we have here. That's correct, and I apologize, Judge Lynn, the witness that I referred to that is not in the appendix is a lane witness who testified at trial and identified the surge block. And what is that witness's name? I'm drawing a blank on it right now. Let's see. I think we'd better get a condom. What we, the parties, regard as the prudent testimony on this. Well, we'd get it on paper. Hmm? We should be able to get it on paper. Well, Your Honor, I can provide that to the court. And this is submitted in the record of the district court proceedings? It is. It should be available? Yes. And we'd be happy to provide that to the court. That would be helpful. Perhaps you could identify to us in just a short paper the name of the witness and where in the transcript we can find the relevant testimony that relates to this surge block and where it came from. Understood, Your Honor. If you could send us the pages. I will. I believe that there was also another exhibit that used that or used another device and we actually showed what a deflector was. That's something else that I believe is part of that testimony that the court should see since you're interested in that issue. The other issue that I wanted to address was, and the court had commented on this earlier in questions to counsel, was with respect to the dependent claims. I think it's clear that given that they've withdrawn 1 and 19, which are the independent claims, claim 2 is necessarily out because claim 2 basically is claim 1 except using exclusively the gasket. So claim 2 is out. There is no, I looked at this and our research indicated that there is no authority for the proposition that somehow they're able to keep claim 2 alive given that they've withdrawn any claim to validity about claim 1. But claim 2 is basically out. Claim 1, of course, has several different devices and therefore could be invalidated based on one of the other devices. That wouldn't be true, I take it, of claim 2. If you read claim 2 as being limited just to the gas gun. Well, claim 1... It allows you to pick one of three different devices. Yes, it does. And I think that because those three are included in claim 1 and all of claim 1 is gone, then necessarily claim 2 will be out. But they are included in claim 1 in a Marc Cush group, which is an alternative. That's correct. In other words, it's A, B, or C. That's not A, B, or C. And obviously that's going to be an issue that the court is interested in and will have to be resolved as to whether their withdrawal of 1 affects 2. Briefly, I wanted to address the remaining claims, which are the dependent claims, 3 through 7. And then we've already discussed number 20. 3 through 7, it's clear that those are obvious. And, in fact, within the record you will see that our expert, Dr. Williams, testified, and this was not controverted by their expert, Dr. Griskell, and I do not believe that Mr. Chominski commented upon this other than to testify about the fact that this Colt air gun is, in fact, adjustable. And that's the point. What Williams did is he specifically went through each one of the chamber volume ranges in the activation intervals. And, in fact, as the court will see from the testimony, beginning somewhere around 4715 of the record, I actually had a chart in front of the jury where we had those claims and we went back and forth between the claims and the patent,  to show that Gibson, in addition we used the Colt air gun publication, that Gibson included all of these ranges. And that necessarily makes these claims, 3 through 7, obvious based upon Gibson. The last point that I wanted to comment on, too, is the testimony of Dr. Griskell. It's clear that that should have been stricken, and I noticed that my time is basically up, so I'll end with that. If you want us to pull it, we'd like more on that. Thank you, Mr. Adams. You have your rebuttal. Thank you, Your Honor. Your Honor, on the issue of that search block, my recollection of that original is a document that Lane prepared, and it was prepared after our patent issue when they were developing the board blocks, the first generation of that. So I don't believe that it was established that that, in essence, was prior art to the deflector that's claiming in Act 20, and we'd be happy to respond, consistent with what Mr. Adams is doing on that issue, if that would assist the Court. But that's my recollection of the source of that exhibit. With regard to claims 3 through 7... So you say that 858 is not prior art. Right.  There are a number of drawings that were produced by Lane early on in the discovery process relating to the development of board blocks, which is the first process they used, and board blocks to follow. And the board blocks uses a deflector, and for that reason we maintained and infringed Claim 20. And I believe that that drawing is from those drawings that Lane prepared after our patent issue by a couple of years, and they were trying to copy and or infringe our patent, and we're using that with their board blocks tool. Is there evidence in the record where you challenged exhibit 858 as being prior art? I don't know that there is, but I guess I would like to check that, if I might. Well, if there is, would you submit that for us? Now, Mr. Adams comes to the discussion about claims 3.3 through 7 by talking about his chart, and I think it's important to note that the chart that he repeatedly presented to the jury was not representative of what the claims actually said. And the chart that he presented said that there were four steps. He needed to have a means for percussive energy, he needed to activate it, he needed to monitor it by video camera, and it had to be adjustable. And the claims don't require an adjustable tool. The claims require adjusting during the process, and specifically adjusting of the amplitude and frequency of the waveform to meet well-performance characteristics. That's claim 1, which would apply to claims 2 through 7. And with regard to claims 20, it requires adjustment of the percussive energy to remove impediments so that well-performance characteristics are in fact met. What is meant by well-performance characteristics? Well-performance characteristics is returning the well to its original production capacity. How do we know that, as opposed to simply obtaining some useful improvement? We know that by virtue of what those of ordinary skill testified to at trial, including Mr. Williams. I mean, those are kind of commonplace words. It seems to me sort of a stretch to say that. It has very specific meaning, unless somebody is saying, in the art, when we say well-performance characteristics, we mean back to 100% of the original state of the well. Is there anything to that effect in the evidence? In any of the evidence? That that's what the term means to a person with skill in the art? There certainly were testimonies by the witnesses of skill in the art, Mr. Frazier, Mr. Jansen, Mr. Tad Carey, Mr. Driscoll, about well-performance characteristics returning it to capacity. Okay, but did any of them say that that term, that expression, means to a person with skill in the art? Only one, one and only one thing, which is back to 100%. I think that Mr. Driscoll said that it could mean more than one thing, but it was his understanding in this context, and that's what it meant. And if you look to the objection objects of the invention in column one of the patent, it talks about increasing well production, water well production. It talks about removing the impediments. And those reviewing the patent who are of skill in the art testified that the objective is to return it to its original capacity. That's what you want to do when you rehabilitate a water well. And then what were the surprising results with regard to this invention is that in some cases it enhanced capacity. In fact, even the document we submitted on another issue, enabling the defendant's representations and claim construction, the foremost harms particular documents, they're in an appendix. In that case, Lane performed their war blast two process, which we maintain infringes, and they enhanced the production to 137%. So everyone's understanding that they're trying to either get it back to the original production or even better if that's possible, and that's, in fact, what this invention has done. So as I was saying, his drawing is very misleading. I mean, Lane has to overcome the presumption that the patent is valid. They did it by clear and convincing evidence, and it's our position that you can't do it by proving only certain of the limitations of the claim or even a distortion of the claim as they did by maintaining all you needed to do was have an adjustable tool. And with regard to Gibson, it's very clear that there's nothing in that patent that talks about adjusting the amplitude and frequency of the waveform to meet well-performance characteristics. They didn't have an oil expert come in. I think you're now over your time. Oh, thank you. Okay. If you want to finish one sentence. I just wanted to say that they didn't have an oil expert in there to testify that anything was going on in the Gibson patent other than using a bolt air gun to churn chemicals. Thank you. Thank you, Ms. Schlicht. Thank you, Mr. Adams. The case is submitted.